In re J.A. JONES, INC., et al., Debtors.

In re Lockwood Greene Engineers, Inc., Jones Lockwood Greene, LLC, Lockwood Greene E & C, LLC, Lockwood Greene Systems Corp., Jones LG, LLC, Debtors.

The Liquidation Committee, Plaintiff,

v.

Binsky & Snyder, Inc., Electro Chemical Engineering & Mfg. Co., Fine Painting and Decorating Co., Inc., Specialty Flooring Systems, Inc., Woolsulate Corporation, EII, Inc., Schoonover Electric Co., Inc., S.M. Electric Co., Inc., Spacesaver Systems of New Jersey, Inc., Clemens Construction Company, Inc., Workspace Solutions, Defendants.

The Post–Confirmation Official Committee of Unsecured Creditors on Behalf of Holders of Allowed Class 6 Claims, Plaintiff,

v.

Lorton Contracting Company, Inc., Defendant.

Bankruptcy Nos. 03–33532, 03–33612, 03–33613, 03–33614, 03–33615, 03–33616.
Adversary Nos. 05–3243, 05–3263, 05–3258, 05–3261, 05–3389, 05–3244, 05–3254, 05–3257, 05–3259, 05–3260, 05–3318, 05–3222.

United States Bankruptcy Court, W.D. North Carolina, Charlotte Division.

Jan. 16, 2007.

Ben Hawfield, Moore & Van Allen, Charlotte, NC, Danielle K. Greco, Anniston, AL, John P. Whittington, Bradley Arant Rose & White LLP, Birmingham, AL, for Debtors.

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

J. CRAIG WHITLEY, Bankruptcy Judge.

These § 547 preference actions are before this Court on Defendants' assundried Motions for Summary Judgment. These motions were considered at a consolidated hearing concluded on September 20, 2006. As described below, these motions are **GRANTED IN PART, DENIED IN PART.**

### PRIOR PROCEEDINGS

J.A. Jones is the parent company of several dozen construction companies. (Together, the "Jones Companies") Until their demise, the Jones Companies performed a wide variety of construction related services, including serving as general contractors on commercial construction projects throughout the world.

Between September 25, 2003 and November 13, 2006 each of the Jones companies filed a Chapter 11 bankruptcy case in this court. These bankruptcy cases were administratively consolidated, and administered in two groups: (1) J.A. Jones and the bulk of its subsidiary companies ("J.A. Jones") and (2) J.A. Jones subsidiary, Lockwood Greene Engineers, Inc. and its group of subsidiary entities ("LGE").

The Jones Companies' cases were liquidating Chapter 11 bankruptcies. Limited operations were conducted as debtors-in-possession until sales of the company assets could be concluded. Eventually, consensual plans were confirmed for both groups: for the LGE group on June 8, 2004(LGE) and on August 19, 2004 for the JA Jones group.

The confirmed plans substantively consolidated estates within the two groups and parceled assets and liquidation responsibilities among the creditor constituencies. Under the J.A. Jones plan, the Post–Confirmation Official Committee of Unsecured Creditors (the "Jones Committee") was tasked with filing and prosecuting avoidance actions. For the LGE group, this duty fell to the Liquidation Committee. Since confirmation, the two Committees have filed numerous avoidance actions under Bankruptcy Code §§ 547–50, including these actions.

The above-captioned actions present similar fact patterns and several common legal issues arising under the preference provisions of the Bankruptcy Code, § 547. The parties have proposed to determine these common legal issues in a joint proceeding, via an opt-in procedure. *See* Order dated May 25, 2006. Each of the above-named Defendants has opted into the group and filed motions for Summary Judgment as to the common issues, based upon stipulated facts.

### STIPULATED FACTS

In each case, before bankruptcy one of the Jones Companies was acting as the general contractor for one or more building projects owned by a third party. The given Defendant was acting as a subcontractor to the Jones Company on the project(s).

The subcontractor performed its required work under its subcontract and submitted requests for payment to its general contractor. The debtor general contractor then paid the subcontractor for its

work. Some of these payments fell within the ninety (90) days before the particular Jones company filed for bankruptcy.

■ In each case, as a condition for payment, the subcontractor executed lien releases in favor of its general contractor. For present purposes, the parties assume each release was given contemporaneously with receipt of payment from the debtor general contractor. At the time of payment, each defendant possessed inchoate [1] lien rights which were released in exchange for these payments. Being paid, none of these subcontractors filed a lien against the projects.[2]

The projects in question located in several different jurisdictions, namely New Jersey, North Carolina, Rhode Island, Washington, D.C., and Virginia, and were subject to differing lien laws.

### PARTIES' POSITIONS

In support of their motions, Defendants' make three common legal arguments: First, under applicable lien law, each subcontractor held inchoate materialman's liens making it a secured creditor. Since, payments to a secured creditor are not preferential,[3] these transfers in exchange for a waiver of these lien rights are not avoidable. Second, Defendants argue the release of their lien rights in exchange for the pre-petition payments constituted a contemporaneous exchange for new value, an affirmative defense to a preference under § 547(c)(1). Third, Defendants assert equitable arguments based upon orders entered in these base bankruptcy cases. *See* Order Authorizing J.A. Jones Construction Co. and Rea Construction Co. and their Subsidiaries to Continue Payments to Subcontractors and Suppliers in the Ordinary Course of Business, Order Authorizing Lockwood Green Engineers, Inc. and Its Subsidiaries to Continue Payments to Subcontractors and Suppliers in the Ordinary Course of Business, and Order Authorizing J.A. Jones Services Group, Inc. and Its Subsidiaries to Continue Payments to Subcontractors and Suppliers in the Ordinary Course of Business dated October 8, 2003 (the "2003 Order").

Plaintiffs disagree with each assertion. They do not believe the Defendants are secured creditors, at least as to the Debtors. They argue the waiver of an inchoate lien right is not "new value" under § 547(a)(2). They do not believe the equitable elements of waiver and estoppel exist relating to the 2003 Order.

**Holding:** Although Defendants may have held statutory lien rights against the individual projects making them secured creditors of the owners, they held no liens against any debtor property. Consequently, they were not secured creditors for § 547(b)(5) purposes. Defendant's equitable arguments relating to the October 8, 2003 orders are rejected for the reasons argued by Plaintiffs. Consequently, Defendants' summary judgment requests based on these two legal theories are **DENIED.**

However, this Court agrees with Defendants that a subcontractor's release of inchoate lien rights in exchange for payment from its general contractor may, under

---

1. An "inchoate" mechanic's lien is defined as a "statutory lien that could have been timely perfected under applicable state law." *In re 360Networks (USA), Inc., et al.*, 327 B.R. 187, 189 (Bankr.S.D.N.Y.2005).

2. At least one defendant (Lorton Contracting) also held filed liens against one of the pro-

jects. These too were released, but the distinction is not presently important as this order is limited to the inchoate lien release issue.

3. Under § 547(b)(5), discussed below.

certain circumstances, constitute a "contemporaneous exchange for new value" affirmative defense under § 547(c)(1). Therefore, on this limited legal issue, Defendants' summary judgment motions are **GRANTED.**[4]

### DISCUSSION

A bankruptcy trustee may avoid a prepetition transfer of a debtor's property upon a showing that the transfer was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within the 90 days before the date of the filing of the petition...; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The preference statute implements the... "prime bankruptcy policy of equality of distribution among creditors. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78, *reprinted in* 1978 U.S.Code Cong

& Admin.News 5787, 5963, 6138. *See also O'Rourke v. Coral Constr., Inc. (In re E.R. Fegert, Inc.)* 88 B.R. 258, 259 (9th Cir. BAP 1988).

Whether a subcontractor's release of inchoate lien rights in exchange for payment shields a transfer from preference attack involves at least two subsections of § 547. The first is § 547(b)(5), the "greater percentage" test. This subsection compares what the creditor received from the alleged preference transfers to the distribution it would have enjoyed in a Chapter 7 bankruptcy case. *Hager v. Gibson*, 109 F.3d 201, 210 (4th Cir.1997).

The second relevant subsection is § 547(c)(1), an affirmative defense that shields otherwise preferential transfers made in a contemporaneous exchange for new value.

The burden of proof is on the Plaintiffs to demonstrate the existence of each of the § 547(b) prima facie preference elements. The burden of proof is on the Defendants to demonstrate existence of the § 547(c)(1) affirmative defense. *See* 11 U.S.C. § 547(g). These subsections are considered in turn.

### I. Section 547(b)(5).

If a bankruptcy estate is insolvent, a debtor's pre-petition payment to a general unsecured creditor enables that party to receive more than it would receive in bankruptcy. *See Smith v. Creative Financial Mgmt., Inc. (In re Virginia–Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir.1992).

In contrast, a pre-petition payment to a secured[5] creditor of the debtor is not

---

**4.** This decision only determines the common legal standard to be employed in these adversary proceedings. Whether a given defendant is entitled to such a defense must be determined in the individual proceedings based upon the specific facts and law of that adver-

sary proceeding. Since discovery has not been conducted, and given the number of defendants, these determinations can not be accomplished in this joint proceeding.

**5.** Assuming the claim to be fully secured, the lien perfected and itself non-avoidable.

preferential. Such a creditor would be paid, if not by the debtor's pre-petition transfer, then out of its collateral. *Id.; See In re Abatement Environmental Resources, Inc.*, 307 B.R. 491, 497 (Bankr. D.Md.2004). A pre-petition transfer on a secured debt eliminates one debtor asset (the transferred property), but simultaneously augments another (by increasing the debtor's equity in the collateral). Since no net depletion of assets occurs, other creditors are not harmed, and the transfers are not avoidable. *Smith*, 954 F.2d at 199.

In the current cases, our first dispute is to whether the Defendant subcontractors are secured creditors for § 547(b)(5) purposes. Defendants insist they are based upon applicable state (and Washington, D.C.) statutes affording mechanics and materialmen lien rights to secure their claims. Typically, these lien rights arise in inchoate form from the first provision of goods or services on the project. They are perfected by the subcontractor filing a claim of lien in a public registry where the project is located. Upon perfection, the subcontractors' liens generally relate back to the first provision of goods and services. If necessary, these liens are enforced by actions filed in state court. *See Generally 53 Am.Jur.2d Mechanics Liens.*

Holding lien rights that, in the absence of payment, could have been perfected and enforced against the projects, Defendants argue they are secured creditors. In support, they cite cases such as *In re Electron Corp.*, 336 B.R. 809 (10th Cir. BAP 2006) and *In re 360Networks (USA) Inc.*, 327 B.R. 187 (Bankr.S.D.N.Y.2005).

The Plaintiffs disagree for several reasons. First, they deny many of these defendants possessed any enforceable lien rights at the time of payments. This assertion is, in turn, founded on two subarguments: (a) under applicable state law, an unfiled subcontractor's claim does not create a lien; and (b) even as to perfected liens, these liens were avoidable under Bankruptcy Code § 545. Plaintiffs rely on cases such as *Precision Walls v. Crampton*, 196 B.R. 299, 303 (E.D.N.C.1996)(Determining that holders of unperfected mechanic's liens not entitled to secured status); *Lewis v. Custom Heating Co. (In re Joseph M. Eaton Builders, Inc.)*, 84 B.R. 56, 58–9 (Bankr. W.D.Pa.1988)(same); *Schoonover Electric Co., Inc. v. Enron Corp. (In re Enron)*, 294 B.R. 232, 239 (Bankr.S.D.N.Y.2003)(lien avoidable in bankruptcy); and *In re RDM Sports Group, Inc.*, 250 B.R. 805, 815 (N.D.Ga.2000), *quoting* 1 David G. Epstein et al., Bankruptcy 6–20, at 582 n. 20 (1992).

Certainly, if a given Defendant did not possess a lien at the time it received payment, the "secured payments" exception to § 547(b)(5) would not apply.

Similarly, if the subcontractor held a state lien that was avoidable in bankruptcy (under § 545, a provision permitting the trustee to avoid certain statutory liens), then the § 547(b)(5) secured payments exception would not apply. *See Hays v. DMAC Investments, Inc. (In re RDM Sports Group, Inc.)*, 250 B.R. 805, 816 (Bankr.N.D.Ga.2000). Plaintiff's argument, that an unfiled subcontractor claim does not create a lien under state law, and therefore, cannot support a secured claim for § 547(b)(5) purposes, is supported by at least two cases. See *In re Joseph M. Eaton Builders, Inc.*, 84 B.R. 56, 58; *Precision Walls v. Crampton*, 196 B.R. 299, 303 (E.D.N.C.1996). However, most reported decisions take the opposite view. *See Ricotta v. Burns Coal & Building Supply Co.*, 264 F.2d 749, 750 (2d Cir. 1959); *Mullins v. Noland Co.*, 406 F.Supp. 206 (N.D.Ga.1975); *In re Electron Corp.*, 336 B.R. 809 (10th Cir. BAP 2006); *In re 360Networks (USA) Inc.*, 327 B.R. 187

(Bankr.S.D.N.Y.2005); *In re Golfview Developmental Center, Inc. v. All–Tech Decorating Co.*, 309 B.R. 758 (Bankr.N.D.Ill. 2004).

We need not decide these issues at present. Each of these arguments requires an analysis of the facts of the particular proceeding and their application to the lien law of the jurisdiction where the project lay. This puts them beyond the scope of this consolidated proceeding. Here, the parties have stipulated to a basic set of common facts and agreed to determine a common, but limited, legal issue: Would the release and waiver of an inchoate lien right be a bar and/or defense to a preference action? *See* Joint Motion of the Liquidation Committee and Various New Jersey Lien Law Defendants for an Order Establishing a Briefing Schedule for Partial Summary Judgment Motions on Release of Inchoate Lien Rights Issue, filed May 11, 2006, ¶ 12. ("Joint Motion.") For present purposes we assume the existence and validity of the asserted inchoate lien rights under state law.

■ Plaintiff's next argument does involve a common legal issue that can be decided at this time. The Committees argue even if the subcontractors had valid lien rights, they would not be secured creditors of the Debtors. Again, our stipulation is each defendant held lien rights against the given project, i.e., the land and improvements.[6] Joint Motion, ¶ 9. The projects are owned by a third party, not the debtor general contractor. Therefore, Plaintiffs argue, defendants were at most secured creditors of the owner, not the Debtors.

■ The focus of the preference statutes is on the effect of a transfer on the debtor, not on the transferee. *In re GEM Construction Corp. of Virginia*, 262 B.R. 638 (Bankr.E.D.Va.2000). (*"GEM II"*) As such, numerous courts, including our own Circuit, view parties holding liens on third party property (but not that of the debtor) to be unsecured creditors for § 547(b)(5) purposes. *See Smith v. Creative Financial Mgmt., Inc. (In re Virginia–Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir. 1992). *See also Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 972 (9th Cir.1995).

As the *Smith* Court explains:

[T]he court must focus, not on whether a creditor may have recovered all of the monies owed by the debtor from any source whatsoever, but instead upon whether the creditor would have received less than a 100% payout in Chapter 7 liquidation. ... This interpretation reflects the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the credit is no better off vis-à-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate.

*Smith v. Creative Financial Mgmt., Inc (In re Virginia–Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir.1992).

Since Defendants held no liens against any debtor property, under *Smith* they are unsecured creditors not shielded by § 547(b)(5) from preference attack.

6. Several of the state statutes also provide the subcontractor with liens on monies owed to the debtor contractor by the owner. Because monies owed the debtor would be estate property under § 541, such liens could give the creditor secured status and present a bar to recovery under § 547(b)(5). However, this determination must also be made in the individual adversary proceedings. The present motions deal only with the subcontractor's inchoate "lien on dirt" owned by a third party.

## II. Does a Subcontractor's release of statutory lien rights constitute a substantially contemporaneous exchange for new value pursuant to 11 U.S.C. § 547(c)(1)?

Defendants' alternatively argue their payments are protected by a § 547(c)(1) "contemporaneous exchange for new value" affirmative defense. That Subsection states:

> (c) The trustee may not avoid...a transfer—
>
>> (1) to the extent that such transfer was—
>>
>>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>>
>>> (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1) (2006). "New value" is defined as:

> [m]oney or money's worth in goods, services or new creditor, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a).

Defendants believe in releasing their lien rights against the projects, they gave commensurate new value to the Debtors. This "indirect transfer" theory holds that the release of the subcontractor's lien against the owner causes a coincident re-lease of the owner's claims against debtor, thereby creating new value to the debtor. *In re GEM Constr. Corp. of Virginia,* 262 B.R. 638, 646 (Bankr.E.D.Va.2000). (*"GEM II"*)

The "indirect transfer" theory assumes that had the debtor general contractor not paid its subcontractor, the subcontractor would have "liened" the project. The owner would be forced to pay the subcontractor, and having done so, would seek indemnification, by a setoff against other sums owed to the debtor. Section 553 preserves setoff rights in bankruptcy and the Code treats setoffs as secured claims. *See* 11 U.S.C. § 506(a).[7] Given this, the indirect transfer theory posits that the bankruptcy estate is not harmed by the pre-petition payments to the subcontractors. *Id.*

Plaintiffs counter that such "but for" assumptions are unwarranted. They argue the statutory inquiry goes no further than, "would the subcontractor have been paid in full from the bankruptcy estate?" Additionally, Plaintiffs argue that such "if they hadn't paid, then we would have..." hypotheticals are not susceptible to proof; or at the least constitute disputed factual assertions inappropriate for summary judgment.

There is some division in the case law on whether the release of inchoate lien rights provides "new value," to the debtor. Some reported cases appear to hold it does not. *See Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 596 (11th Cir.1990); *In re Cocolat, Inc.,* 176 B.R. 540, 548 (Bankr.N.D.Cal.1995); *Cimmaron Oil Co., Inc. v. Cameron Consultants, Inc.,* 71 B.R. 1005, 1009 (N.D.Tex.1987), *Ragsdale v. M & M Elec.*

---

7. The indirect transfer theory can be asserted under § 547(b)(5) as well as § 547(c)(1). *See Mason and Dixon Lines, Inc. v. St. Johnsbury Trucking Co. (In re Mason and Dixon Lines, Inc.),* 65 B.R. 973, 979 (Bankr.M.D.N.C. 1986). Because our stipulation assumes defendants held no liens against any debtor property, this court treats the argument under § 547(c)(1) as an affirmative defense.

*Supply, Inc.* (*In re Control Elec., Inc.*), 66 B.R. 624, 626–27 (Bankr.N.D.Ga.1986); *Tidwell v. Bethlehem Steel Corp.* (*In re Georgia Steel, Inc.*), 56 B.R. 509, 522 (Bankr.M.D.Ga.1985).

Other cases hold that such a release can be considered "new value," provided certain factual circumstances exist. *See Simon v. Engineered Protection Sys., Inc.* (*In re Hatfield Elec. Co.*), 91 B.R. 782, 786 (Bankr.N.D.Ohio 1988); *Mason and Dixon Lines, Inc. v. St. Johnsbury Trucking Co.* (*In re Mason and Dixon Lines, Inc.*), 65 B.R. 973, 979 (Bankr.M.D.N.C.1986); *LaRose v. Crosby & Son Towing, Inc.* (*In re Dick Henley, Inc.*), 38 B.R. 210, 214 (Bankr.M.D.La.1984); *GEM II*, 262 B.R. 638 (Bankr.E.D.Va.2000).

■ In an unpublished decision, this Bankruptcy Court has sided with those courts holding that a release of inchoate lien rights can provide new value. *Cooper v. Barfield Industrial Services, Inc.*, Case No. 04–3172 (June 8, 2005 Hodges, J.). We reaffirm that decision today.

Section 547 requires us to hypothesize what the subcontractor would have received in bankruptcy had the allegedly preferential payment not been made. We cannot fairly assess how the subcontractor would have fared without projecting how it would have reacted to nonpayment. Since an individual subcontractor's reaction is unknowable, an objective approach should be employed, asking "what would a reasonable materialman have done in response to that nonpayment." It takes little commercial construction expertise to answer. A reasonable subcontractor would assert his legal rights, liening the project, perfecting those liens and forcing payment through the owner.

We should also assume a reasonable behavior by the project owner. Again, this requires almost no imagination. With liens on this project, the owner would have no reasonable alternative but to pay the subcontractor and then seek indemnification from the general contractor.

To make any other assumption would defy reality. It would also penalize the lien creditor for accepting payments. *Ricotta*, 264 F.2d at 750 ("The sole purpose of filing liens is to secure payment. Surely the receipt of payment itself should not be less secure than the lien which could have secured it.") It would also defy commercial reality. A subcontractor would not long remain in business if it made a practice of refusing payments from its general contractor in favor of enforcing lien rights against the underlying project. No one would hire such a subcontractor.

Actually, the split in the case law on whether release of inchoate lien rights constitutes "new value" is not as wide as it initially appears. A close reading of the cases reveals that the primary variant in these cases is whether, at the time of the preference payment, the owner still owed sufficient sums to the debtor on the project to permit a setoff against the owner's payment to the sub. If the owner still owes the debtor, then its indemnity claim can be setoff and is secured. In this context, most courts consider the "indirect transfer" to provide new value. If there is no debt to be setoff, however, then the owner's claim for indemnification is simply an unsecured debt and there is no "new value." *See Nordberg v. Arab Banking Corp.*, 904 F.2d 588, 596 (11th Cir. June 27, 1990); *In re GEM II*, 262 B.R. at 646–47; *In re Hatfield Electric Co.* (*Simon v. Engineered Protection Systems, Inc.*), 91 B.R. 782, 786 (Bankr.N.D.Ohio 1988); *In re Cocolat, Inc.*, 176 B.R. 540, 548, n. 4.; *In re Bownic Insulation Contractors, Inc.*, 134 B.R. 261 (Bankr.S.D.Ohio 1991).

Other factual distinctions can also affect the viability of the new value defense. Like the § 547(b)(5) lien, if the owner's

setoff would not be permitted under state law; or if the setoff is not allowed under § 553,[8] then the owner's claim against the debtor becomes an unsecured claim for indemnity, and the transfer is not for "new value."

At this point, we lack the factual details necessary to say whether a given subcontractor's release of lien rights in exchange for payment constituted equivalent new value to provide a § 547(c)(1) defense. For now we can only answer the underlying legal question holding that such a release could constitute new value, provided the requisite showing is made.

**III. Does the Order dated October 8, 2003 (the "2003 Order") preclude the recovery of these payments as preferences?**

**A. The 2003 Order is Not Entitled to A Preclusive Effect Against the Committee.**

Early in these cases, the Debtors–in–Possession filed emergency motions (the "2003 Motion"), seeking discretionary authority to pay specific lien claimants their pre-petition claims. The gist of the motions was as follows: Several of the Debtors' construction projects were still ongoing at the petition date, and there was value remaining in some of those contracts. The Debtors maintained certain subcontractors were owed pre-petition debts needed to be paid if they were to continue work. If these subcontractors pulled off the jobs, the value of the contracts would be lost. The Debtors asked for discretionary authority to pay these particular subcontractors. These motions were noticed to creditors and approved without objection.

Through this and many other actions, Debtors were able to complete those projects and to collect the monies owed them; or alternatively to assume and assign many of the uncompleted contracts to third party buyers. The sales generated hundreds of millions of dollars for the estates.

Because payment of the pre-petition claims of some subcontractors was approved, Defendants assert the Committees may not now bring preference actions seeking to recover pre-petition payments to any subcontractors. Their theories sound in equitable theories akin to waiver and estoppel.

This Court agrees with the Plaintiffs that these equitable theories do not bar Plaintiffs from attempting to recover preferential transfers made by the Debtor to the Defendants.[9]

First, the Debtor's statements made in connection with the 2003 Motion are not binding on these post-confirmation creditor's committees, negating judicial estoppel. Issue preclusion is similarly unwarranted as the Plaintiff committees are not in privity with the Debtor. Third, these Committees did not exist at the time when these orders were entered and did not have an opportunity to litigate the 2003 Motion or the issue of such payments to subcontractors. Finally, at no point did the Debtors in the 2003 Motions ask this Court to waive preference actions; nor would this Court have entertained such a suggestion without an extensive preference analysis, committed review and/or a confirmed plan.

**A. The Committee is Not Judicially Estopped from Recovering the Preferential Transfers.**

Judicial estoppel is used to prevent a party from intentionally contradict-

---

**8.** Section 553 does not recognize a pre-petition setoff in certain enumerated circumstances. 11 U.S.C. § 553.

**9.** As defined in Defendant's Motion for Summary Judgment, p. 1.

ing itself in hopes of obtaining an unfair advantage. *See Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir.1996). The Fourth Circuit has enumerated four elements that must be met before a court may apply judicial estoppel:

> (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently.

*Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283, 292 (4th Cir.1998) (*citing Lowery,* 92 F.3d at 224). As explained below, the Defendants fail to satisfy these elements because: 1) the Debtor's statements are not "assertions of fact"; 2) the statements cannot be considered "assertions" due to the equivocal language used by the Debtor; 3) this Court has not accepted any of the statements or positions; and 4) the party to be estopped, the Committee, did not make the statements.

 Judicial estoppel cannot be applied to the statements relied upon by the Debtors in the 2003 Motion because they are not "assertions of fact." The application of judicial estoppel cannot be applied to an assertion of law. *Pittston Co. v. United States,* 199 F.3d 694, 701 n. 4 (4th Cir.1999) ("[J]udicial estoppel applies only to the making of inconsistent statements of fact, and therefore is of no relevance to [the litigant's] legal contention . . . ."); *Marathon Oil Co.,* 149 F.3d at 292; *Folio v. City of Clarksburg,* 134 F.3d 1211, 1217–18 (4th Cir.1998) ("[T]he position must be one of fact, rather than law or legal theory."). Defendants cite part of the 2003 Motion, which states, "the Subcontractors *may* have mechanic's liens and material-

men's lien rights" and "the Subcontractors *may* be secured creditors." Brief of Lorton Contracting Co. at 18, *The Liquidation Committee v. Lorton Contracting Company,* Case No. 05–3222 (Bankr.W.D.N.C. May 31, 2006) (emphasis added). Any statement regarding the validity of a mechanic's lien and/or a creditor's secured status is an assertion of law to which judicial estoppel does not apply.

In addition, these statements can hardly be considered "assertions" given the Debtor's frequent use of equivocal, open-ended, and conditional language, such as the word "may" (used four times) and "if" (used once) in the passage relied upon by Defendants. *Id.* Simply put, the 2003 Motion cannot be reasonably interpreted as a definitive recitation of the Debtor's position.

 Defendants also fail to satisfy the requirements for judicial estoppel because the 2003 Order cannot be considered an acceptance by this Court of the Debtor's position. This Court did not find that the Debtor's assertion was true or correct; the Court simply allowed the motion in the absence of any objection. *See Holloway v. Bass & Assoc., P.C. (In re Holloway),* 337 B.R. 6, 10 (Bankr.D.Mass.2006) ("[The plaintiff] goes too far in her assertion that 'the Court determined [a party's secured status] . . . ; [the court] simply allowed the motion . . . because no objection was filed.").

 Lastly, the use of judicial estoppel is inappropriate in this case because the "party to be estopped" would be the general body of unsecured creditors, *not* the party that made the statement, which is the Debtor. Certainly, Defendants have not identified any prior position or assertion by the Committees that is inconsistent with the one they have taken in these proceedings.

## B. The Doctrine of Issue Preclusion Does Not Bar Recovery of the Preferential Transfers.

The application of issue preclusion is also inapplicable because the Debtor and the Plaintiff Committees were not in privity at the time of the 2003 Order. Privity in this sense means a successor in interest to the party, or one whose interests were adequately represented in the earlier action. *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir. 1990). At best, these committees, formed under the confirmed plans would succeed the unsecured creditors committees, not the Debtors. It cannot be said that the Debtors adequately represented the unsecured committees because they and the creditors committees serve different roles. If the debtor adequately represented the creditors, there would be no need for a creditors' committee under the Bankruptcy Code.

It is instructive that courts have held that a trustee is not in privity with the debtor when seeking to avoid certain of the debtor's pre-petition transfers:

When a trustee seeks to assert a debtor's cause of action against a third party the trustee stands in the debtor's shoes and is subject to all valid claims and defenses, including inequitable conduct, which the third party has against the debtor. When seeking to avoid a preferential transfer, however, the trustee is not asserting a cause of action belonging to the debtor but asserting an action in a representative capacity for general unsecured creditors. As stated by the court in *Teiger v. Stephan Oderwald, Inc.*, 31 F.Supp. 626, 627 (S.D.N.Y.1940) (citations omitted), "in an action to recover a preference, representations made by the bankrupt are not material ... In respect to the representations, there is no privity between the trustee

and the bankrupt and the doctrine of estoppel is inapplicable to the trustee."

*Harvey Hooper Lobsters, Ltd. v. Best Pack Seafoods, Inc. (In re Best Pack Seafoods, Inc.)*, 29 B.R. 23, 24–25 (Bankr.D.Me.1983) (citations omitted); *See also DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 66 B.R. 349, 362, 362 n. 18 (Bankr.E.D.Tenn.1986) (*citing Schneider v. O'Neal*, 243 F.2d 914, 918 (8th Cir.1957)) ("Exercising an avoidance power as a representative of the estate, the trustee does not stand in the shoes of the debtor... [The] trustee stands in the 'overshoes of the creditors.'"). The Plaintiffs' roles in prosecuting avoidance actions on behalf of these estates is the same as that of a trustee—the right to prosecute avoidance actions does not belong to the Debtor, but to the Debtor's estate. As such, there is no privity between the Debtor and the Committee. The Plaintiffs are not restricted by the 2003 Motion.

Defendants suggest the Creditors Committees had the opportunity to object to the entry of the 2003 Order, making issue preclusion applicable despite the lack of privity. Brief of Lorton Contracting Co. at 22–23, *The Liquidation Committee v. Lorton Contracting Company*, Case No. 05–3222 (Bankr.W.D.N.C. May 31, 2006). However, in the J.A. Jones base case, the 2003 Order was entered on October 8, 2003, twelve days *before* the Committee was even formed. *See* Order Appointing Unsecured Creditors Committee, entered October 20, 2003.

Issue preclusion is also inappropriate in this case because the 2003 Motions and Orders cannot be said to "resolv[e] the issue in a final and binding judgment." Brief of Lorton Contracting Co. at 22. Although a final Order, the 2003 Order allowed the Debtor to use its discretion in choosing which subcon-

tractors it would pay: "the Debtors are *authorized, but not directed* to pay Subcontractor claims...." 2003 Order at 2 (emphasis added). This language cannot be interpreted to mean that *all* subcontractors would be paid. Neither the Creditors Committees, nor the Court, would have reason to suspect that the Debtor would make payments that would deplete the estate to the detriment of the creditors it represents. This is particularly true since these orders were intended to augment the estate in limited situations where a subcontractor's continued performance was vital to the contract, and where completion or cure of the contract was vital to augmenting the estates.

Finally, the waiver of a preference action is not undertaken lightly in bankruptcy. Such relief is occasionally requested by a secured creditor as a condition of cash collateral use in post-petition financing to the Debtor in possession. This Court disapproves of the practice and has never allowed such a waiver without creditor review after a thorough preference analysis. Even then, such a waiver would be limited to preferential transfers made to that specific creditor, not to all creditors unless approved in a confirmed Chapter 11 plan, a wholesale waiver of preference claims in a bankruptcy case is unprecedented in this judicial district.

The Court, therefore, **GRANTS IN PART AND DENIES IN PART** the Defendants' joint Motion for Summary Judgment consistent with this Order. Further, pretrial conferences will be conducted in each of these adversary proceedings, for the purpose of setting discovery periods. These pretrial conferences will be held on March 6, 2007 at 2:00 p.m. in the Charles R. Jonas Federal Courthouse, Courtroom No. 122, 401 W. Trade Street, Charlotte, North Carolina.

**SO ORDERED.**